UNITED STATES of America, Appellee,

v.

Larry JOHNSON, Appellant.

No. 78–5206.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1979.

Decided June 19, 1980.

340

Stanford E. Lacy, Asst. Federal Public Defender, Columbia, S. C., for appellant.

Eric Wm. Ruschky, Asst. U. S. Atty. (Thomas E. Lydon, Jr., U. S. Atty., Mary G. Slocum, Asst. U. S. Atty., Columbia, S. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, FIELD, Senior Circuit Judge, and MURNAGHAN, Circuit Judge.

HAYNSWORTH, Chief Judge:

After a jury trial, defendant was convicted of armed bank robbery and assault of bank employees with a dangerous weapon. 18 U.S.C. §§ 2113(a), (d), 2. He appealed, complaining of the admission into evidence of a photographic spread shown to witnesses of the crime, and of a pistol found in the defendant's possession at the time of his arrest two weeks after the robbery. We affirm.

I.

Shortly after noon on February 21, 1978, two black men, each armed with a handgun, robbed a branch bank in Columbia, South Carolina. Witnesses within the bank furnished descriptions of the clothing worn by the two men, including the fact that the one in the grey suit was wearing a large false mustache. A bank employee also told of the placement in the packets of bills of a cannister of dye designed to explode upon removal from the bank and to release the dye.

Later that same afternoon, the getaway car was found near an apartment complex. A witness there had seen two men dressed as the witnesses in the bank described the attire of the robbers. The witness saw one of the men enter a particular apartment, in which the defendant's cousin resided. Her cousin and his friend had been there. Her description of their dress was in agreement with the descriptions obtained from the witnesses in the bank. She consented to a search of her apartment, during which a large false mustache was discovered in a trash can, while a .22 caliber long rifle bullet was found just outside the rear door of her apartment. On that afternoon she had noticed a red stain on the defendant's grey suit.

The cousin told the police that she had driven the defendant and his friend to the home in which the defendant's girlfriend resided. In her testimony, the girlfriend confirmed the description of the clothing of the two men. She testified to the presence of a red stain on defendant's grey suit and to having seen the defendant's cousin attempting to wash red stain from currency.

Two weeks later, the defendant was arrested in New Jersey. At the time, he was in possession of a .22 caliber handgun loaded with long rifle ammunition like the bullet found near the rear entrance to his cousin's apartment.

On the afternoon of the defendant's arrest and the next day, witnesses in the bank were shown a photographic spread consisting of mug shots of six black males, one of whom was the defendant. The photographs of the defendant had been taken following an unrelated arrest a few weeks before his arrest on charges growing out of the robbery of the Columbia bank. Four of the witnesses in the bank picked out the photographs of the defendant as resembling the man in the grey suit with sunglasses and the false mustache. Neither of the four could be more certain in identification.

At the trial there was in-court identification by the four witnesses of the defendant as resembling the robber with the false mustache wearing the grey suit. Neither could be more positive. One of them volunteered to having made a similar identification from the photographic spread. Others testified to the same effect upon inquiry by counsel for the government.

At the end of the government's case, the photographic spread was introduced into evidence, the lower front portion of each photograph had been masked to conceal police identification numbers. The back portion of the defendant's photographs had also been masked. The back portion of the other photographs in the spread contained information about the person's name, aliases which had been used, and the date and place of the making of the photograph.

The .22 caliber handgun in the defendant's possession at the time of arrest was also introduced into evidence.

During the jury's deliberations, it made an inquiry of the court as to the date upon which the photographs of the defendant were taken. The judge declined to answer the inquiry, since disclosure of the date of the photographs would strongly suggest an arrest in New Jersey several weeks before the defendant's arrest on the charges being tried. The jury had been told that such photographs of the defendant had been made on the day of his arrest for the Columbia bank robbery. The judge's declination to respond to the inquiry thus left the jurors free to think or to speculate that these mug shots of the defendant were made in connection with these charges and did not necessarily suggest earlier criminal conduct.

## II.

█ Defendant contends that introduction of the photographs allowed the jury to infer that he had committed previous crimes. He asserts that, because he did not testify and thus did not place his character in issue, the evidence was inadmissible. Of course, Rule 404(b), Federal Rules of Evidence, prohibits the admission of evidence of past criminality for the purpose of establishing a criminal propensity. Such evidence is admissible, however, for other purposes, including proof of identity. Since the photographs were used for that purpose here, the issue presented is whether the court abused its discretion because the prejudicial impact of the evidence outweighed its probative value. *United States v. Fosher*, 568 F.2d 207, 212–13 (1st Cir. 1978).

There was little difference in the quality of the identification of the defendant by the witnesses at trial as resembling the robber in the grey suit from their statements after viewing the photographic spread. Since the jurors had heard repeated references to the use of the photographic spread, however, they may have entertained substantial doubts about the fairness of the spread and may have been concerned that any unfair-

ness in the spread may have affected the in-court testimony. Introduction of the photographic spread served the salutary purpose of enabling the jurors to judge for themselves the basis upon which the witnesses had made the very general and tentative identification. The introduction of the spread was neither entirely gratuitous nor was it for no legitimate purpose. Withholding of the spread from the jury may have caused its members to wonder why it was not presented to them, and any explanation of a withholding of the spread would have revealed the fact of the defendant's earlier arrest.

 Admission of masked police photographs is well within the discretion of the trial judge when it is likely the jury would believe that the defendant's photograph was taken after the arrest upon charges upon which he is on trial. *See United States v. Johnson*, 495 F.2d 378, 384 (4th Cir. 1974); *United States v. Calarco*, 424 F.2d 657, 661 (2d Cir. 1970). At the time of the admission of the photographic spread there was every reason to think that the likelihood was that the jurors would think that. The photographs were very recent, made only three weeks before his arrest in this case. There was no perceptible change in the defendant's appearance in the photographs and his appearance in the courtroom. There was nothing in the circumstances calculated to make the jurors think the photographs were taken earlier than the arrest in this case. The masks on the back of the defendant's photographs were not likely to have led the jurors to think otherwise. The backs of the photographs of the other men contained considerable information in addition to the date upon which it was taken. Masking the back of the defendant's photographs could not have been reasonably thought to have been attached for the purpose of concealing the date, rather than other information. Nor was there any reason to anticipate a later inquiry from the jury about the date of the photographs.

The judge's declination to answer that inquiry may have excited some speculation or suspicion, but with the judge's response as the only thing conceivably pointing to an earlier date of the photographs, it surely was not incumbent upon the trial judge, sua sponte, to declare a mistrial upon his declination to respond. It does not require a reversal in this court. The fact remains that the presence of any thought in the mind of any juror that the defendant's photographs were made before his arrest in this case is entirely speculative.

We may assume that, from the poses of the subjects, members of the jury may have recognized these as mug shots. From the presence of the masking tape the jurors may have speculated that someone had felt the need to conceal information which otherwise might have been revealed to them, but there was nothing in the manner in which the photographs were introduced to create a suspicion that such information was prejudicial or to cause the jury to attach undue significance to the masking. The prosecution did not seek to introduce the photographs before they were masked. While examining one witness, the prosecutor asked whether she could identify the photographic spread as that which was shown to her by authorities. Defense counsel objected because the spread was not in evidence. The prosecutor then stated that he had not intended to introduce the spread because he did not think that material on the back of the photographs was "relevant to this case," after which it was agreed in open court that the questioning would proceed without introduction of the photographs. The trial continued and thereafter the masking of the photographs and the resolution of the question of admissibility occurred out of the presence of the jury and before the pictures were seen by its members. Thus there was no extended discussion in the jury's presence of the need to mask the photographs because of the presence of prejudicial material and no heated bench conference at which the masking was done in the jury's view. These circumstanc-

es support a distinction between this case and those relied upon by the defendant.[1]

Moreover, in weighing the probative value of the photographic spread and its assistance to the jury in judging the reliability and consistency of the tentative identifications of the witnesses against the prejudicial impact of their admission, we properly look to the strength of the other evidence in the case. It was very strong. There was an attempt to impeach the credibility of the two women, the cousin and the girlfriend, but this could detract little from the consistency of the descriptions of the clothing worn by the two men made to law enforcement officials during their investigation and repeated at trial. There was the presence of red dye and the undeniable recovery of a false mustache meeting the description of the witnesses in the bank. It all fitted nicely into one picture of complicity and guilt.

Bearing in mind that the witnesses who chose the defendant's picture and who testified at the trial could do no more than express an opinion that the defendant and his pictures resembled the robber, there was no reasonable possibility that speculation about the dates of the photographs could have been the thing which tilted the minds of the jurors to a belief of guilt beyond a reasonable doubt. It may be said with assurance that the verdict would have been the same if the defendant's photographs had been taken after his arrest in this case and the jury had been informed of the fact.

### III.

Defendant contends that the pistol was inadmissible because irrelevant or, if relevant, as being too prejudicial. He also asserts that the evidence was confusing in light of testimony by a hardware store salesclerk who stated that she sold .357 magnum ammunition to defendant's cousin and two black men, whom she could not identify, the day before the robbery.

We conclude that admission of the pistol was within the broad discretionary power of the trial court. The pistol was loaded with .22 caliber long rifle bullets such as the one found just outside the cousin's back door on the day of the robbery. Defendant's presence at her apartment on the day before, and the day of, the robbery was well established. Additionally, the girlfriend testified that the defendant and his colleague were each armed with a handgun on the day of the crime. Thus the gun was linked circumstantially to the robbery and was relevant to show that the defendant possessed the means of robbing the bank by the use of a dangerous weapon. Finally, we do not believe that evidence of the purchase of .357 magnum ammunition confused the jury. Because of the undisputed evidence that both robbers were armed with handguns, the purchase of the .357 magnum bullets was not inconsistent with the defendant's use of a .22 caliber pistol.

*AFFIRMED.*

---

1. *United States v. Fosher*, 568 F.2d 207, 216 (1st Cir. 1978); *United States v. Harrington*, 490 F.2d 487, 495 (2d Cir. 1973); *Barnes v.*

*United States*, 365 F.2d 509, 512 n. 7 (D.C. Cir. 1966).